**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-CR-21-JAR-SPM |
| | ) | |
| RASHAWN GALLOWAY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**AND MEMORANDUM OPINION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and is currently before the Court on Defendant Rashawn Galloway's ("Defendant" or "Galloway") Motion to Suppress Evidence, ECF Nos. 36 & 85, which has been contested by the United States. ECF Nos. 40 & 89. The issue raised by the motion is whether officers executing arrest warrants for Galloway violated the Fourth Amendment when, after taking Galloway into custody, they entered the residence to conduct a protective sweep and following the sweep seized a gun and extended magazine from a table in Galloway's bedroom. The undersigned has carefully considered the evidence presented, the applicable law, and the arguments of both parties. For the reasons discussed below, the undersigned finds, and respectfully recommends, that Galloway's motion be denied.

**BACKGROUND AND PROCEDURAL HISTORY**

On January 29, 2025, a federal grand jury returned a one-count indictment charging Galloway with being a felon in possession of a firearm on October 7, 2024, in violation of Title 18, U.S.C. §922(g)(1). ECF No. 2. The firearm Galloway is accused of unlawfully possessing

was seized from Galloway's residence on October 7, 2024, by members of a joint U.S. Marshal Service, Great Lakes Regional Fugitive Task Force who went to Galloway's residence to arrest him pursuant to three arrest warrants. On December 1, 2025, Galloway filed a motion to suppress the firearm and a corresponding magazine on grounds that those items were the fruit of a warrantless search that violated the Fourth Amendment. *See* ECF Nos. 36 & 85. The United States filed its response opposing Galloway's motion on grounds that the gun and magazine were in plain view during a constitutionally valid protective sweep of Galloway's residence. *See* ECF Nos. 40 & 89.

On December 23, 2025, the undersigned entered an order scheduling an evidentiary hearing on January 14, 2026. The evidentiary hearing was rescheduled for April 10, 2026, after Defendant twice moved to continue the suppression hearing to review additional disclosures received from the United States. *See* ECF. Nos. 41 and 43. One day before the scheduled hearing, on April 9th, the parties advised the undersigned that in preparing for the hearing, they learned that the witness initially designated to testify about the discovery of the firearm—Deputy U.S. Marshal Robert Stafford ("Deputy Stafford")—was not the officer who first saw the firearm. Instead, the firearm was discovered by a previously undisclosed officer—Retired Task Force Officer Robert Ley ("Officer Ley"). ECF No. 53.[1] The parties requested that a second evidentiary hearing date be set to allow for testimony of the newly disclosed witness. *See id*. *See also* ECF No. 59, (Apr. 10th Evid. Hrng. Tr). at 3-4. The Court agreed to the request made by the parties and the hearing began on April 10th as scheduled. *Id.* The newly disclosed witness, Officer Ley, was scheduled to testify on April 24, 2026. *Id.* at 3.

---

[1] The April 10, 2026, Evidentiary Hearing Transcript (ECF No. 59) reflects the phonetic spelling of Officer Ley's name, thus, his name appears in the transcript as "Lee."

At the hearing on April 10th the United States called three witnesses to testify—Supervisory Deputy U.S. Marshal William Weier ("Deputy Weier"), Deputy Stafford, and ATF Special Agent Aaron Spears ("Agent Spears"). The Court also admitted eleven exhibits offered into evidence by the United States including copies of the arrest warrants for Galloway (Govt. Exhs. 1 & 2); Deputy Weier's body camera footage (Govt. Exh. 11); photographs of the firearm and magazine that were seized (Govt. Exhs. 9 & 10) and various photographs of the residence both before and after officers entered it (Govt. Exhs. 4, 5, 6 & 8). *See* ECF No. 57. Galloway did not call any additional witnesses but relied on cross examination testimony from the United States' witnesses. Galloway also offered six exhibits into evidence, including photographs of Galloway's residence after officers breached the residence. (Deft. Exhs. E, F, I & J). *Id.*

On the morning of April 24, 2026, the parties advised the undersigned that Officer Ley was unable to appear due to a medical emergency, and it was unclear when he would be available to testify. After conferring with the parties, the undersigned continued the hearing until June 2, 2026. *See* ECF Nos. 76 and 77. Officer Ley did not appear at the hearing on June 2, 2026. Instead, the Assistant United States Attorney advised the Court that, even after attempting to refresh his memory, Officer Ley had no independent recollection of the events of October 7, 2024, and the parties agreed to stipulate that, if called to testify, Officer Ley would say he has no independent recollection of the events of October 7, 2024. *See* ECF. No. 83, June 2nd Evid. Hrng. Tr. at 2-6. The Court accepted the parties' stipulation and admitted three additional exhibits offered by the United States, *see* ECF No. 78 and Govt. Exhs. 12, 13 & 14, and fifteen additional exhibits offered by Galloway, *see id.*, including additional photographs of Galloway's residence after officers breached the residence (Deft. Exhs. G, H); body camera footage from the Deputy Marshals who were part of the task force (Deft. Exhs. L (Deputy Garret), M (Deputy Sirianni), N

(Deputy Adkins), Z (Deputy Schulte), & AA (Deputy Dimick)); and still shots from Deputy Weier's body camera footage of the front room where the firearm was seized (Deft. Exhs. P, Q, R & S). Following the hearing on June 2, 2026, the undersigned set a briefing schedule for the filing of post-hearing briefs. *See* ECF No. 81.

Although post-hearing briefing concluded on July 30, 2026, the eleventh-hour disclosure of Officer Ley and his subsequent inability to appear required the undersigned to spend a significant amount of time, unaided by any explanatory testimony, carefully reviewing and re-reviewing the digital and photographic evidence the parties submitted at the June 2nd hearing. The undersigned also found it necessary to conduct significant additional research beyond the case law reflected in the parties' written submissions to address all of the issues raised by the motion, including the parties' dueling arguments about the burden of proof and the impact of that burden considering the absence of Officer Ley's testimony.

## FINDINGS OF FACT[2]

### *A. Testimony of Deputy Weier*

Deputy Weier testified that, on October 7, 2024, he led a fugitive task force comprised of Deputy United States Marshals and various task force officers from different local, state, and federal agencies to 4315 Marcus in the Eastern District of Missouri to execute three separate arrest warrants for Galloway: (i) a federal warrant for supervised release violation; (ii) a state

[2] These factual findings are based on (i) the hearing testimony of Deputy Weier, whose testimony the undersigned found to be credible and consistent with other non-testimonial evidence of record; (ii) the testimony of Deputy Stafford, to the extent it was consistent with Deputy Weier's testimony and other non-testimonial evidence of record; and (iii) non-testimonial evidence admitted at the hearing on April 10, 2026, and June 2, 2026 to the extent such evidence was relevant to the legal issues raised by the motion and supported by other evidence of record. Although the testimony of Agent Spears was credible, it was not relevant to the key legal issues raised by the motion to suppress, and he was not present at the time of the search of the residence or seizure of the gun and magazine.

warrant from St. Charles County, Missouri for Assault first, Armed Criminal Action, and Unlawful Use of a Weapon; and (iii) a state warrant from Madison County, Illinois for two counts of Aggravated Battery. *See* Govt. Exhs. 1 & 2. At the time, Deputy Weier was a veteran Supervisory Deputy United States Marshal in the Southern District of Illinois.

Before attempting to arrest Galloway, Deputy Weier and his team first confirmed information by a source that Galloway lived at 4315 Marcus and was, in fact, present at the residence on October 7, 2024. Deputy Weier and the case agent, Deputy Sirianni, briefed the team about the nature of the offenses, the warrants at hand, Galloway's criminal history, and any other violence or security concerns. Deputy Weier also briefed the team about the structure/residence, the neighborhood, provided a picture of Galloway, and discussed contingency plans. Deputy Weier advised the team that Galloway was likely armed, violent, and had a history of fleeing and alluding from law enforcement. Deputy Weier made the team aware that there were two other individuals at large in connection with the Illinois offense Galloway was being arrested for.

After arriving at Galloway's residence, Deputy Weier and his team established a perimeter, then knocked and announced their presence. The team heard movement coming from inside the house, but there was no response. After a brief wait that lasted less than a minute, Deputy Weier ordered the team to breach the door with a battering ram. After the team breached the door, Officer Ley broke a window next to the front door to better see into the residence. At first, the officers could not see any individuals in the house, but they could see shadows moving behind a door near the back of the house; they heard voices and eventually heard someone say "two people in here" or words to that effect. Deputy Weier commanded the occupants to come out "crawling." Galloway and another man complied by crawling out to the front porch, where

the officers were standing. When asked if there was anyone else in the house, the other man indicated there was not. Galloway was then taken into custody.

Deputy Weier acknowledged that they did not have a search warrant for the residence but explained that, for several reasons, a protective sweep of the residence was necessary under the circumstances. First, even though Galloway had been arrested and the other occupant stated there was no one else in the residence, Deputy Weier, who at that time had been involved in thousands of arrests, stated people lie to law enforcement all the time about the presence of other occupants in a home. He also pointed out his concern stemming from the fact that he had learned that there were two other men at large in connection with one of the offenses for which Galloway was being arrested. Deputy Weier described past experiences of officers who have been shot at by an undisclosed person inside a residence. Second, Deputy Weier pointed out that because they had breached the door and broke the front window, officers would need to secure the premises and leave paperwork for any owners or other occupants to seek compensation for repairs. So, for the safety of those officers, it was important to make sure the house was "clear."

According to Deputy Weier, "clearing" a house means looking in places where a person could be hiding, such as behind a shower curtain, under a bed, etc. It does not include looking in places where a person could not hide such as a medicine cabinet, drawer, or other small space. Deputy Weier explained that the team worked in tandem, with one set of officers clearing the rooms to the right of the front door and a second set of officers clearing the rooms to the left of the front door. The bedroom where the gun and magazine were found was one of the rooms to the right of the front door and was at the front of the house adjacent to the front porch. Deputy Weier and one or two officers went first to that front bedroom, which was later determined to be Galloway's bedroom. Deputy Weier testified that he "held" a doorway that connected the front

bedroom to an interior hallway while the officers backing him up went into the room to clear the closet and other areas of the bedroom. *See* ECF No. 59, at 87.

Deputy Weier testified that, although he walked through the front bedroom multiple times, he personally did not observe a gun during the protective sweep. *Id.* at 54-56. Deputy Weier explained it would not be unusual for officers to miss seeing a firearm because, during a protective sweep, the officers are focused on ensuring there are no people in a residence. Deputy Weier also testified that if officers observed an unsecured firearm during a sweep, that would be highly concerning for officer safety, and he would expect the officer to secure the gun by posting up next to it; he would also expect the officer to notify the team about the presence of a gun. *Id.*, at 52-53. Deputy Weier testified that because of the "tandem" approach they used during the sweep the team was "talking a lot [to each other]" to make sure they knew where everybody was. *Id.* at 87. However, Deputy Weier was never alerted to the presence of a gun during the sweep and never saw an officer posted up next to the gun during the sweep and, after watching his body camera video multiple times at the hearing he agreed that "at no point does the audio of that video capture any communications about a firearm." *Id.* at 53-54 & 57.

On cross examination, Deputy Weier acknowledged that various items in the front bedroom had been moved around during the protective sweep. *See id.* at 69-74 and Deft. Exhs. E & F. For example, a box fan that had been near the table at the start of the sweep, ended up on the bed with its frame detached; a duffel bag that was previously seen on Deputy Weier's body camera video sitting on a chair, ended up on the floor; and items of clothing including a hat and a boot that did not appear to previously be on the floor, at the end of the sweep, were seen on the floor. ECF No. 59, at 69-74. Deputy Weier denied that the movement of those items meant that

the officers were engaging in a "full investigatory search" but was unable to explain why those items were moved. *Id.* at 73-74.

Deputy Weier testified that the protective sweep lasted no more than five minutes and, once he determined there were no other threats in the house, that was the end of the sweep, so he deactivated his camera and left the house:

> Q. All right. Let's leave that up for just a second. Now, finally this footage ends with you exiting the residence; is that correct?
> A. Yes, sir.
> Q. Why did you turn your body cam off at that point?
> A. That is Marshal Service policy. Once the house is under control of law enforcement they say to deactivate your body cameras.
> Q. Was anyone located inside 4315 Marcus that day?
> A. No, sir.
> Q. How long would you say you were inside the residence for the safety sweep?
> A. I'd say five minutes.
> Q. Why so brief?
> A. Security sweep is brief.
> Q. Once you made the determination there is [sic] no other threats, that is the end of the sweep?
> A. Absolutely.
> . . .
>
> Q. If the protective sweep had still been ongoing, there would have been no need to shut [your camera] off, correct? You would have kept it going?
> A. Yes, sir.

*Id.*, at 32 & 67-68.

After Deputy Weier left the house, he checked on Galloway and the other individual who had been in the house. He also checked on damage done to the residence upon entry. After he performed those tasks, Deputy Weier learned that one of his team members identified a firearm in the residence, so he notified the rest of the team. He subsequently returned to the house to observe the firearm but acknowledged he never saw it "sitting in its natural place." *Id.* at 58.

***B. Testimony of Deputy Stafford***

Deputy Stafford testified that he was part of the team of officers who entered the house to conduct the protective sweep. He did not clear the bedroom where the gun and magazine were later seen. He cleared the rooms located to the left of the front door, which included the living room and dining room area and a second bedroom near the rear of the house adjacent to the kitchen and the basement stairs. He testified that Deputy Weier and other officers, including Officer Ley, cleared the rooms located to the right of the front door, including the front bedroom where the gun and magazine were found. Deputy Stafford testified that although Marshal policy required him to wear a body worn camera, he left his camera behind that day and was not equipped with a body camera.

Deputy Stafford testified that the sweep lasted no more than five minutes. Shortly after he finished clearing the left side of the house, Deputy Stafford went into the front bedroom on the right side of the house. While there, he observed the "grip" of the gun and extended magazine on the table in front of the window Officer Ley had breached before the team entered the residence. *Id.*, at 103. The gun was "partially obscured" by a curtain which was "pulled out of the window, another part [of the curtain] was pulled over and everything was kind of lying give or take in a heap on top of [the] table with an overturned lamp." *Id.*, at 99. The gun was "on the table amongst all the other stuff that was like laying on top of it . . . [such as] some clothes, an overturned lamp, a hair pick and obviously, the curtains." *Id.* Deputy Stafford testified that although the gun was partially obscured, before he touched or manipulated the gun in any way, he "could see the extended magazine" which was attached to the gun. *Id.* at 99 & 144. Deputy Stafford testified that he took the photographs of the gun admitted into evidence at the hearing. *See* Govt. Exhs. 9 & 10. He acknowledged he took the photographs only after he picked up the

gun, separated the extended magazine, and moved both items so that he could take pictures of them. ECF No. 59, at 101, 116-119. He testified that he mistakenly failed to take a picture of the gun in the position where he found it.

Deputy Stafford gave two reasons for going into the front bedroom after he cleared the left side of the house. First, he testified Officer Ley "indicated that he believed he saw a firearm on a table in front of [the] window he had breached." *Id.* at 97. Although Deputy Stafford could not recall when, where, or how Officer Ley relayed that he saw a gun, *id.* at 98-99, he testified he "went straight [to the front bedroom]" when he learned that Officer Ley saw a gun. *Id.* at 143. Deputy Stafford testified there "was a lot of stuff going on" and it could have been shortly after Deputy Stafford entered the residence or shortly after the protective sweep concluded. *Id.* at 115, 141-42.

Deputy Stafford testified that he did not immediately alert other officers to the presence of the gun because he "figured" Officer Ley had already alerted to the others about the gun during the sweep. *Id.* at 121-22. He testified that he would have expected Officer Ley to notify other officers about the presence of the gun during the sweep because Officer Ley was "famous for communicating every tiny little thing that ever happened over the radio" and he would be "surprised" to learn that he (Deputy Stafford) was the only officer alerted to the presence of a gun discovered during a protective sweep. *See id.*, at 122 & 149. Officer Ley was not with Deputy Stafford when he first saw the gun and magazine, and Deputy Stafford could not say that the gun and magazine were in the same place Officer Ley first observed them. *Id.* at 150. Deputy Stafford testified that he also could not say whether Officer Ley or anyone else may have moved or manipulated the gun before Deputy Stafford first observed it. *Id.* Deputy Stafford acknowledged that, based on screen shots and video footage from Deputy Weier's body camera,

items in the front bedroom appeared to have been moved around before he arrived at the bedroom. *See id.* at 127.

Based on Deputy Stafford's testimony, a second reason he went to the front bedroom was to document "any type of damage" done by the arrest team and to photograph any "evidence to be had." *See id.* at 138-39, 144-45. Deputy Stafford explained that because Marshal policy required him to take pictures of "any type of damage" done by the arrest team and because "there was evidence to be had" he was in that bedroom taking photographs to document the state of the door and window that had been breached as well as "evidence to be had" including the gun, *id.* at 145, and other items like the hat and boot that the lead investigator or detectives from the state police department had indicated were "important." *See id.,* at 138-39 & 144-145. Deputy Stafford testified that he contacted the St. Charles County Police Department and made them aware of the gun, and they said they would come out to retrieve it. *Id.* at 104. So, the team "held the residence" until St. Charles County officers came to seize the gun and magazine. *Id.*

***C. Video and Other Photographic Evidence***

As detailed above, this Court admitted body camera video footage and photographs into evidence at the evidentiary hearings on April 10th and June 2nd. The body camera video evidence consisted of videos from the following Deputy Marshals: Deputy Weier (Govt. Exh. 11); Deputy Garret (Deft. Exh. L); Deputy Sirianni (Deft. Exh. M); Deputy Adkins (Deft. Exh. N); Deputy Schulte (Deft. Exh. Z); and Deputy Dimick (Deft. Exh. AA). The photographs received into evidence included still shots from Deputy Weier's body camera footage of the front room where the firearm was seized (Deft. Exhs. P, Q, R & S); and time-stamped photographs taken by Deputy Stafford of the gun and magazine and front bedroom. *See* Govt. Exhs. 12, 13 and 14; Deft. Exhs. F and H.

As Deputy Weier explained at the evidentiary hearing, a total of eleven officers were involved in the execution of the warrant. *See* ECF No. 59, at 37. Seven of the eleven officers were Deputy United States Marshals who were required by Marshal policy to wear body worn cameras during the operation: Deputies Weier, Stafford, Schulte, Sirianni, Adkins, Demick, and Garret. *Id.* The remaining four officers were task force officers who were not required to wear body worn cameras: Officers Ley, Opal, Wright, and Bowers. *Id.* Based on the video evidence, it appears that consistent with USMS policies and procedures for executing arrest warrants, Deputy Weier and all other Deputy United States Marshals, except for Deputy Stafford, wore body cameras and kept their body cameras on during the arrest of Galloway and the protective sweep. Deputy Stafford left his body worn camera behind and was not wearing a body camera that day. Task Force Officers, such as Officer Ley, were not required to wear body worn cameras.

Based on the video evidence, on October 7, 2024, Galloway crawled out of the residence and was taken into custody on the front porch of the house around 11:09AM. [3] *See* Govt. Ex. 11, at 02:58; *see also* Deft. Exh. M (Sirianni body camera video), at 02:43-03:10. Less than one minute later, the second occupant crawled out and indicated there was no one else in the house. *See* Govt. Ex. 11, at 03:25. Almost immediately after the second occupant was removed, Deputy Weier and two other officers, including Officer Ley, entered the house around 11:10 AM. *Id.* at 03:45-03:46. Based on the video evidence, it appears that only two Deputy Marshals with body cameras entered the residence— Deputy Weier and Deputy Garret—along with Deputy Stafford. The remaining officers who entered the house were task force officers and were not wearing

[3] During the hearing, Deputy Weier explained that the time stamp on the body camera video was one hour later than the actual time. *See* ECF No. 59, at 23.

body worn cameras. The video evidence generally corroborates the testimony that Deputy Weier and one or two other officers, including Officer Ley, cleared the rooms located to the right of the front door, including the front bedroom, a bathroom, the kitchen and an interior hallway connecting those rooms. S*ee* Govt. Ex. 11, at 03:35-03:56 (Deputy Weier's body camera video footage and audio depicting team of officers turning toward right front bedroom and capturing Officer Ley's voice describing the bedroom to Deputy Weier and another officer). The video evidence also confirms that a second team of officers, including Deputies Stafford and Garret, cleared the rooms located to the left of the front door. *See* Deft. Exh. L. Based on a review of the video recording from all Deputy Marshals, no officer indicated that he saw a gun or magazine during the time the officers' body cameras were recording.

***1. Evidence from Deputy Weier's Body Camera***

Based on the video evidence, as he entered the house, Deputy Weier can be seen turning toward the front bedroom and heard saying "We're going to take this room to the right." Govt. Exh. 11, at 03:34-03:35. A second officer followed Deputy Weier into the residence, and that officer was then followed by the officer identified during the hearing as Officer Ley. As the officers entered the house, an officer, presumably Officer Ley, can be heard describing his observations from the front porch and saying "that's the room I could see . . . ." *Id.* at 03:44-04:10. But, there is no mention of a gun or extended magazine. Although the camera lens was mostly obstructed by Deputy Weier's shield, gun, or other equipment for the first few minutes of the video, the audio recording on the video supports Deputy Weier's testimony that he initially "held" the door to the hallway while the backup officers "back cleared" the front room. *Id.* at 03:38-04:03. The video evidence corroborates Deputy Weier's testimony that the scope of the sweep was limited to looking into areas where a person could hide. The video reflects that during

the protective sweep the officers stayed behind their shields, communicated in a way that showed they were concerned regarding potential threats, looked into areas where a person could hide such as closets, under a bed, and behind a shower curtain, and limited their sweep to exclude areas that would be inaccessible to those threats (such as behind a bolted door). *See* Govt. Ex. 11. The video evidence also corroborates Deputy Weier's testimony that no officer, including Officer Ley, reported or mentioned seeing a firearm during the sweep.

Shortly after the 05:00 minute mark, at around 11:12AM, while the officers were still clearing the rooms near the back of the house, Deputy Weier appears to lower his shield, turn, and walk through the front bedroom of the house (perhaps for a second or third time); Deputy Weier then circles back toward the kitchen via the living room, while reporting out over the radio that "target is in custody" and "we're securing the residence now." *Id.* at 05:00-05:39. As he walked past the table in the front bedroom where the gun was later observed by Deputy Stafford, Deputy Weier's body-worn camera captured the tabletop. *See id.* at 05:29-05:30; *see also* Deft. Exhs. P, Q, R & S. Although one can see objects on the table including what appears to be a remote control, shards of glass, an overturned lamp, and the curtain that appears to have fallen onto the table when Officer Ley broke the window before the team entered the house, the still images are grainy and even when considered together with the video evidence, the undersigned is unable to determine from the photographs and video evidence whether the gun and magazine were or were not observable while Deputy Weier and the other officers were clearing the room.

Based on the video evidence, Deputy Weier circled back to the rear of the house around 11:12AM and advised another officer he was "not worried" about a door that was deadbolted. *See* Govt. Exh. 11, at 05:53. At that point, the second team of officers clearing the back bedroom (including Deputy Stafford) can be seen exiting the back bedroom and entering the kitchen. *See*

*id.* at 05:53-06:21. Shortly after that, an officer can be heard asking, "We're good?" to which Deputy Weier responded, "yeah." *Id.* at 06:29-06:32. At that point, Deputy Weier began to walk out of the house and shut off his body camera at 11:13 AM.

### *2. Deputy Garret's Body Camera*

Video evidence from Deputy Garret also reflects that, while Deputy Weier and his team cleared the right side of the house, other officers, including Deputy Garret, were clearing the left side of the house, including a bedroom near the back of the house. *See* Govt. Exh. L. Deputy Garret's body camera, like Deputy Weier's body camera footage, was also obstructed for the first several minutes of the sweep. However, the camera's audio recorder captured the officers' communications with each other during the sweep and confirms that no officer mentioned seeing a firearm during the sweep.

Once Deputy Garret entered the back bedroom, he appeared to lower his shield and his camera became unobstructed. At that point, officers can be seen clearing the back bedroom including looking under the mattress. *Id.* at 05:27-05:42. The officers then left the back bedroom and entered the kitchen where they quickly looked behind curtains and shined a flashlight through a frosted glass windowpane, among other things. At that point, an officer is heard asking "we're good?" *Id.* at 05:45-06:03. The response is inaudible, but it is clear from the video that, like Deputy Weier, Deputy Garret started to walk through the living room area toward the front door. Deputy Garret turned off his body camera at 11:13AM. *See id.* at 06:06-06:19.

### *3. Time-stamped Photographs*

Assuming the time stamps on the photographs are accurate, Deputy Stafford took photographs of the gun and magazine at 11:15 A.M, *see* Govt. Exhs. 12, 13, and 14, and photographed the room (and items in the room) around 11:17 A.M. *See* Deft. Exhs. F and H.

## CONCLUSIONS OF LAW

Based on the foregoing factual findings, on October 7, 2024, officers executing three separate arrest warrants arrested Galloway and took him into custody on the front porch of his residence around 11:09 AM. Less than one minute later, a second occupant crawled out and indicated there was no one else in the house. Almost immediately after the second occupant was removed from the house, at approximately 11:10 AM, officers entered Galloway's house to conduct a protective sweep. By 11:13 AM, the protective sweep was over and the lead officer, Deputy Weier, exited the house. Approximately two minutes after the sweep ended, at approximately 11:15 AM, Deputy Stafford seized a gun and extended magazine from a table in Galloway's front bedroom and subsequently relinquished them to officers from the St. Charles County Police Department. Galloway contends officers violated the Fourth Amendment by entering his residence and seizing the gun and magazine without a warrant.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Warrantless searches and seizures by law enforcement are per se unreasonable without an exception to this warrant requirement. *See Coolidge v. New Hampshire,* 403 U.S. 443, 474 (1971); *United States v. Lewis,* 864 F.3d 937, 943 (8th Cir. 2017) ("[a] warrantless seizure is per se unreasonable, unless the police can show that it falls within a carefully defined set of exceptions"); *United States v. Morris*, 995 F.3d 665, 668 (8th Cir. 2021) (searches conducted outside the judicial process, without prior approval by a judge or magistrate are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions").

In this case, the United States argues there was no Fourth Amendment violation because the gun and extended magazine were seen in plain view during a protective sweep of Galloway's house. In *Coolidge,* 403 U.S. at 465, the Supreme Court held, "[i]t is well-established that under certain circumstances the police may seize evidence in plain view without a warrant." As the Supreme Court has explained, "plain view provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment" and the doctrine is "perhaps better understood . . . not as an independent exception to the warrant clause, but simply as an extension of whatever the prior justification for an officer's access to an object may be." *Texas v. Brown,* 460 U.S. 730, 738-39 (1983). The Supreme Court in *Brown* reasoned that, as the natural result of "any search, legal or illegal," in the "vast majority of cases, ***any*** evidence seized by the police will be in plain view, at least at the moment of seizure." *Id.* at 737 (emphasis in original). So, the Court held that the test for determining whether property in plain view of police may be seized "must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question." *Id.*

In applying the "plain view" principles first established in *Coolidge,* the Eighth Circuit has held that, to qualify under the plain view exception, the government must prove that "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Mattox,* 27 F.4th 668, 674 (8th Cir. 2022) (quoting *United States v. Vinson*, 805 F.3d 1150, 1152 (8th Cir. 2015)).[4] The United

[4] The Eighth Circuit has also articulated the plain-view factors as requiring that "(1) the item is in plain view; (2) the officer is lawfully located where he may view the object; and (3) the incriminating nature of the evidence is "immediately apparent."" United States v. Clay, 579 F.3d 919, 932 (8th Cir. 2009) (quoting *Horton v. California*, 496 U.S. 128, 136 (1990)).

States has the burden of proving that this exception to the warrant requirement applies. *See United States v. Green,* 560 F.3d 853, 856 (8th Cir. 2009) (holding the "the government bears the burden of proving that [the plain view during a protective sweep] exception to the search warrant requirement applies").

### A. *DID OFFICERS VIOLATE THE FOURTH AMENDMENT IN ARRIVING AT THE PLACE FROM WHICH THE GUN AND MAGAZINE COULD BE PLAINLY VIEWED?*

The United States argues it meets the first prong of the plain-view test because the evidence demonstrates the officers were authorized to enter Galloway's residence under the protective sweep exception. A constitutionally valid protective sweep is one of the circumstances in which officers are authorized to conduct a warrantless search of a residence. In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court upheld the "protective sweep" as an exception to the warrant requirement under the Fourth Amendment. The Court held a protective sweep "[i]s narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. In the context of a "protective sweep" incident to the arrest of an individual at home, a lawful arrest does not necessarily justify a search of the arrestee's entire home incident to the arrest. However, "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officers possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. This means that "incident to an arrest [an] officer could, as a precautionary matter and without probable cause or reasonable suspicion, look into closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched." *Id.* at 334. To comport with the Fourth Amendment, the sweep must be quick and cursory of those areas and spaces where a person may be found and can last no longer than is necessary to dispel the danger. *Id.* at 336.

The Eighth Circuit has held that, under *Buie,* "a protective sweep may extend only to a cursory inspection of those spaces where a person may be found" and must be "quick and limited" and "initially confined to places large enough to conceal a person." *United States v. Green,* 9 F.4th 682, 692 (8th Cir. 2021) (quoting *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999) (quoting *Buie*, 494 U.S. at 327)); *see also United States v. Alatorre*, 863 F.3d 810, 815 (8th Cir. 2017) (holding a task force conducted a constitutional protective sweep "because it lasted only two minutes and was confined to places large enough to hide a person"). "During a properly limited protective sweep, the police may seize an item that is in plain view if its incriminating character is 'immediately apparent.'" *Green,* 9 F.4th at 691 (quoting *Green*, 560 F.3d at 856) (quoting *Horton v. California*, 496 U.S. 128, 136 (1990)). However, police violate the Fourth Amendment if the protective sweep either was not authorized as prescribed by *Buie* or exceeded the scope authorized under *Buie. See Green,* 9 F.4th at 692-93. (holding police violated the Fourth Amendment because even if protective sweep of defendant's apartment was valid, the scope of the sweep violated the Constitution where the sweep "lasted around ten minutes and included looking inside kitchen cupboards, trash cans, and even inside a shoebox").

***1. The protective sweep was authorized under Buie.***

The Eighth Circuit has held that *Buie* prescribes "when and how officers may conduct a protective sweep in the context of one conducted incident to an arrest." *Green,* 9 F.4th at 691. First, under *Buie, "**as a matter of course**,* officers may look in spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* (emphasis in original) (quoting *Buie*, 494 U.S. at 334). To sweep beyond those "immediately adjoining" spaces, officers must have ***reasonable suspicion*** to believe dangerous individuals are hiding in the area to be swept. *Id.* (emphasis in original).

Although Galloway initially challenged the validity of the protective sweep, *see* ECF No. 36, at 5-7, in his post-hearing brief Galloway appears to concede that the sweep was authorized under the circumstances. *See* ECF No. 85, at 18-20. The undersigned agrees. Based on the factual findings, Galloway was arrested on his front porch, which was immediately adjacent to the front bedroom, the front hall, and the living room area of the house. Because the front door of the house had been broken open, those adjacent rooms were open to the officers standing on the porch. Given their proximity to the area where Galloway was arrested, the rooms adjacent to the porch were subject to a sweep "as a matter of course" under *Buie. See Green*, 9 F.4th at 691. In addition, Deputy Weier articulated specific concerns for officer safety including the knowledge that there were additional defendants at large in connection with one of the charges Galloway was being arrested for. Coupled with the unexpected presence of the second occupant at the house, those facts were sufficient to justify a sweep of rooms beyond the rooms adjacent to the front porch. *See id.*

In terms of its scope, the initial sweep, which lasted less than five minutes, appears to have been sufficiently brief and limited to a cursory inspection of those spaces where a person may be found to comport with *Buie* and the Fourth Amendment. As the factual findings demonstrate, the video evidence corroborates Deputy Weier's testimony that the scope of the sweep was limited to looking into areas where a person could hide. The video reflects that during the protective sweep the officers stayed behind their shields, communicated in a way that showed they were concerned regarding potential threats, looked into areas where a person could hide such as closets, under a bed, and behind a shower curtain, and limited their sweep to exclude areas that would be inaccessible to those threats (such as behind a bolted door). *See* Govt. Ex. 11.

In sum, the undersigned finds that, based on the evidence presented, the officers were authorized under *Buie* to conduct a protective sweep of the residence.

The fact that officers were authorized to conduct a protective sweep under *Buie* does not necessarily answer whether the seizure of the gun and magazine was legal. Instead, the test for determining whether property in plain view of police may be seized "turn[s] on the legality of the intrusion that enables them to perceive and physically seize the property in question." *Brown*, 460 U.S. at 737 (emphasis in original). Thus, even when police are authorized to conduct a warrantless search, they violate the Fourth Amendment if, without probable cause, they take action "unrelated to the objectives of the authorized intrusion," and that action "expose[s] to view concealed portions of the [residence] or its contents." *Arizona v. Hicks,* 480 U.S. 321, 323-326 (1987) (holding that an officer who was lawfully on the defendant's premises pursuant to the exigent circumstances exception to the warrant requirement violated the Fourth Amendment by moving stereo components, which the officer had reasonable suspicion but not probable cause to believe were stolen, to view their serial numbers; moving the components was a search, and the plain view doctrine could not justify the search or seizure of the components because the officer lacked probable cause to believe the components were stolen before disturbing them and recording their serial numbers).

Based on the factual findings, no officer perceived the gun and magazine during the brief, three-minute-long protective sweep. However, less than two minutes after the sweep ended, Deputy Stafford entered Galloway's bedroom to search for the gun in reliance on Officer Ley's statement that he "believed" he saw a gun on the table in the front bedroom near the window he broke before the team entered. Although the gun was almost completely concealed on the table, Deputy Stafford testified that before he touched or manipulated the gun, he was able to see the

grip of the gun and the extended magazine. Galloway does not dispute that the gun was in plain view when Deputy Stafford first saw it. Instead, Galloway appears to argue that the United States failed to satisfy the first prong of the plain-view test because it failed to prove the gun and magazine were in plain view when they were first discovered by Officer Ley. In support of this argument, Galloway points to evidence that the gun and magazine were not observed by any officer during the initial sweep of the bedroom; evidence that items in the room were moved around during the sweep; and Deputy Stafford's testimony that he could not say that when he first observed the gun and magazine, they were in the same location Officer Ley first observed them and could not say if Officer Ley or any other officer manipulated the gun and magazine before he saw them. *See* ECF No. 85, at 14-18. Admittedly, this Court's ability to determine whether the gun and magazine were discovered because they were in plain view or whether, as Galloway insinuates, they were concealed during the sweep and came into the officers' view as the result of an "intrusion" that violated the Fourth Amendment has been complicated by the fact that Officer Ley—the officer who presumably first perceived the gun—did not testify at the suppression hearing.

In *United States v. Kiyuyung,* 171 F.3d 78 (2nd Cir. 1999), the Second Circuit Court of Appeals confronted similar gaps in evidence presented at a suppression hearing. The defendant in *Kiyuyung* was convicted of being a felon in possession of two firearms after his motion to suppress the firearms was denied by the district court. The charges stemmed from the warrantless seizure of two firearms from an apartment the defendant shared with his girlfriend. *Id.* at 79-80. Police discovered the firearms when two members of a police car-theft task force arrested the defendant's girlfriend after spotting her driving a car that a rental company had reported as stolen. *Id.* The arrest took place outside the apartment and, after the officers placed defendant's

girlfriend under arrest, they entered the apartment because she pleaded with the officers to let her use the bathroom in the apartment. *Id.* Before allowing defendant's girlfriend to use the bathroom, one of the officers, Officer Abousamra, conducted a safety sweep of the apartment, including the bathroom and a hallway leading to the bathroom. *Id.*

The only officer to testify at the suppression hearing, Officer Abousamra, did not see a gun during the initial protective sweep. *Id.* at 80-82. However, Abousamra testified that, while they were waiting for defendant's girlfriend to use the bathroom, his partner, Officer Quiles, who had posted himself outside the bathroom door, called Abousamra over and pointed out a gun sitting on the edge of a shelf outside of the bathroom door. *Id.* The officers then observed two additional guns on the shelves outside the bathroom door. *Id.* When the officers confronted defendant's girlfriend with the guns, she said they belonged to the defendant, who later appeared at the police station and confirmed that the guns belonged to him. *Id.* at 82. Following the suppression hearing, the district court ruled that, based on evidence presented at the suppression hearing, the guns were in plain view and, therefore, denied the defendant's suppression motion. *Id.*

On appeal, the Second Circuit reversed the conviction holding the district court should have granted Kiyuyung's motion to suppress because the government failed to establish that the guns were found in plain view. *Id.* at 83. The Second Circuit noted that, based on evidence presented at the suppression hearing, the closet where the guns were discovered had doors and, because of the closet's proximity to the bathroom, if the closet doors had been opened, they would have partially obstructed the entrance to the bathroom as defendant's girlfriend attempted to enter the bathroom. *Id.* at 82. In holding that the "government did not meet its burden of

showing that the guns were discovered because they were in plain view," the court in *Kiyuyung* reasoned:

> the only witness called by the government was Abousamra, who was not the officer who found the first gun. If Abousamra had testified that he observed the guns in plain view while he was conducting his security sweep of the apartment, which included the path past the hall closet, the district court would have been entitled to find that the government had met its burden. . . . But Abousamra did not testify that when Quiles found the first gun it was in plain view. He could not so testify of his own knowledge because he was not with Quiles when Quiles found the gun; according to Abousamra, Quiles found the first gun and then summoned Abousamra to look at it. Nor did Abousamra testify that Quiles told him Quiles had spied the gun in plain view; rather, when asked if he knew how Quiles had discovered the gun, Abousamra testified, "He just said, Paul, come over here and look what I found here, there is a gun right on the edge of the shelf right here." Further, although the hall closet clearly was open after [defendant's girlfriend] entered the bathroom, allowing Abousamra, in response to Quiles's summons, to go and see the gun Quiles found—and to see two additional guns "in plain view"—there was no evidence whatever that the closet doors were open before [defendant's girlfriend] entered the bathroom. Abousamra did not testify that the closet doors were open when he made his security check; he repeatedly said he did not even remember whether the closet had doors. The closet did have doors, and there was no evidence as to the position of those doors before Quiles saw the first gun, because Quiles was not called to testify.

*Id.* at 83-84.

The Second Circuit expressed skepticism that, under the circumstances, Abousamra would have failed to notice that the closet doors near the bathroom were opened during his safety sweep. *Id.* at 84. The *Kiyuyung* court concluded:

> In sum, although the district court found that Abousamra testified that the guns were in plain view, Abousamra in fact did not testify that he saw the guns during his security search, did not testify that the closet doors were open before [defendant's girlfriend] entered the bathroom, did not testify that Quiles said the closet doors were open, and did not even venture to ascribe to Quiles a conclusory statement that the first gun had been in plain view. Since the government elected not to have Quiles testify, the only plain-view evidence in the record was that the guns were in plain view after Quiles found one.

*Id.* at 84.

The Eighth Circuit confronted a similar situation in *United States v. Green,* 560 F.3d 853 (8th Cir. 2009). In *Green,* the officer who discovered a gun in plain view did not testify at the suppression hearing; however, the Eighth Circuit upheld the district court's finding that a rifle and ammunition found in a closet were in plain view even though the only witness to testify about the rifle and ammunition lacked personal knowledge about where those items were originally located. *Green*, 560 F.3d at 857. The Eighth Circuit held the district court's finding was not clearly erroneous because the defendant conceded that the closet was large enough to conceal a person and the court properly credited the testimony of the testifying officer who stated that the officer who discovered the gun said, "the rifle was visible as soon as he opened the closet door." *Id.* (holding "the district court may rely on hearsay evidence at a suppression hearing") (quoting *United States v. Thompson,* 533 F.3d 964, 969 (8th Cir. 2008)). *Green* and *Kiyuyung* illustrate that, depending on the circumstances, the absence of testimony from the officer who first discovered an item that is the subject of a motion to suppress need not be fatal to the government's ability to satisfy its burden of proving that an item was discovered because it was in plain view.

***2. Based on the evidence, the gun and extended magazine were more likely than not discovered because they were in plain view.***

As in *Green,* this Court may rely on Officer Ley's hearsay statement that he believed he saw a gun on the table in the front bedroom. Although Officer Ley's hearsay statement in this case is not as detailed as the hearsay statement relied on in *Green*, unlike the situation in *Green*—where the officer had no personal knowledge of where the gun was located—Deputy Stafford testified that in response to Officer Ley's statement he "immediately" went to Galloway's front bedroom where he was able to observe the grip of the gun and extended magazine on the table for himself. When Deputy Stafford first saw the gun, it was "partially obscured" by the curtain which was

"pulled out of the window, another part [of the curtain] was pulled over and everything was kind of lying give or take in a heap on top of [the] table with an overturned lamp." *Id.*, at 99. The gun was "on the table amongst all the other stuff that was like laying on top of it . . . [such as] some clothes, an overturned lamp, a hair pick and obviously, the curtains." *Id.* Deputy Stafford testified that although the gun was partially obscured, before he touched or manipulated the gun in any way, he "could see the extended magazine" which was attached to the gun. *Id.* at 99 & 144.

Although the facts of this case bear some similarity to the facts in *Kiyuyung,* significant differences set this case apart. Implicit in the Second Circuit's holding in *Kiyuyung* was the conclusion that the guns were discovered on the shelves of a closet with doors that, more likely than not, were closed during the protective sweep. Unlike the guns discovered in *Kiyuyung*, the gun and extended magazine in this case were discovered on top of a table whose contents would normally be exposed to the view of anyone walking through the bedroom. As the Supreme Court has explained, "[t]he rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993) (internal citations omitted). *See also Horton*, 496 U.S. at 133 (holding that "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy"). The fact that the gun and magazine were sitting on a tabletop and would have been exposed to the officers' view but for the curtain that got "pulled down" before the officers entered the house makes it questionable that Galloway would have had any legitimate expectation of privacy independent of the initial intrusion—the protective sweep—that gave the officers their vantage point.

As luck would have it, based on the factual findings, parts of the tabletop, including the gun and magazine, were at least partially concealed from view by a curtain that Officer Ley inadvertently pulled down when he breached the window from the front porch of the house before the team entered to conduct the protective sweep. Assuming, without deciding, that Galloway could somehow claim a legitimate expectation of privacy in the parts of the tabletop concealed by the curtain, the undersigned finds that, based on the evidence and the factual findings, the gun and magazine were more likely than not discovered because they were within the plain view of Officer Ley immediately after the sweep ended. Specifically, as the factual findings demonstrate, before the officers entered the house, Officer Ley was captured on Deputy Weier's body camera describing the front bedroom and made no mention of seeing a gun. During the sweep, which lasted no more than three minutes, the officers stayed behind their shields, communicated in ways that reflected their focus was on ensuring there were no other people in the house, and looked in places (like behind a shower curtain) where a person might hide. Although Officer Ley cleared the same set of rooms as Deputy Weier, and, according to Deputy Stafford, was "famous" for calling out every detail over the radio, no officer including Officer Ley, is captured on video communicating about seeing a gun during the sweep.

Once the sweep ended, the lead Deputy (Deputy Weier), and the only other Deputy Marshal equipped with a body camera, (Deputy Garret), turned off their cameras and can be seen preparing to exit the house. It is apparent from the evidence and testimony of Deputy Stafford that he was tasked with documenting damage and any "evidence to be had" following the sweep; so, it makes sense that he would remain in the house for that purpose. Finally, given the very short amount of time that passed between the time Deputies Weier and Garret turned off their body cameras (11:13AM) and Deputy Stafford observed and photographed the gun and magazine (11:15 AM),

it is unlikely that Officer Ley would have had sufficient time to discover the gun underneath the curtain, uncover it, and alert Deputy Stafford to its presence. Instead, for the reasons articulated above, the undersigned finds it more likely than not that the gun was partially concealed by the curtain, missed by the officers while sweeping the room, and perceived by Officer Ley only after the immediate threat dissipated and the officers were preparing to exit the residence.

In considering the totality of the circumstances, the undersigned finds that evidence that no officer saw the gun and magazine during the sweep does not, as Galloway suggests, make it more likely that the gun and magazine were not in plain view. As discussed above, the evidence showed that the gun and magazine were partially concealed by the curtain. Photographs of the gun and magazine also suggest that, in addition to being partially concealed by the curtain, both were likely well-camouflaged on the table during the sweep. This is because the gun was black, like the curtain, and the extended magazine was made of clear plastic. Evidence that the gun and extended magazine were partially concealed and camouflaged by the curtain helps to explain why they were likely missed by the officers conducting the protective sweep. These facts also distinguish this case from the circumstances described in *Kiyuyng* in which evidence that the closet doors would have partially blocked the entrance to the bathroom if they were opened made it unlikely that the officer would have failed to notice if the closet doors were open during the sweep.

The undersigned also finds that, after considering the totality of the circumstances, evidence that items in the room were moved around does not, as Galloway suggests, make it more likely that the gun and magazine were brought into plain view as the result of an investigative search. This is because the evidence presented did not establish that any of the items that were moved around in the room, such as the fan, the duffel bag, and clothing, were moved from the

table where the gun was found. Nor was there any evidence suggesting that the curtain had been manipulated or disturbed in any way during the brief three-minute-long sweep.

In sum, although the absence of Officer Ley's makes this a close call, the undersigned finds that when all evidence of record is considered, the United States satisfied the first prong of the plain-view test because the officers were authorized to enter Galloway's residence to conduct a protective sweep, Deputy Stafford observed the grip of the gun and the extended magazine in plain view on the table, and there is no evidence that Officer Ley or any other officer took any additional unauthorized action that exposed the gun and magazine to Deputy Stafford's view.

### B. *Was the Incriminating Nature Immediately Apparent?*

The Eighth Circuit has held, "[d]uring a properly limited protective sweep, the police may seize an item that is in plain view if its incriminating nature is immediately apparent. In this context, immediately apparent means that the police have probable cause to believe an item is incriminating. *United States v. Williams,* 951 F.3d 892, 896 (8th Cir. 2020) (internal citations omitted) (quoting *Green,* 560 F.3d at 856). Galloway does not appear to challenge the second prong of the plain view test—whether the incriminating nature of the gun and magazine were immediately apparent. Indeed, there was evidence presented that officers "later determined" that the front bedroom where the gun and magazine were found was Galloway's bedroom. *See* ECF No. 59, at 55. Assuming the gun and magazine were discovered ***after*** officers determined the front bedroom was Galloway's bedroom, based on the pre-arrest briefing described by Deputy Weier, any member of the team who discovered the gun and magazine in the bedroom would have immediately recognized the incriminating nature of the gun and magazine. Because Galloway does not challenge the second prong, and based on the evidence presented, the undersigned assumes the United States has met the second prong of the plain view test.

### C. *Did Deputy Stafford Have Lawful Access to the Gun and Magazine?*

Galloway contends the government failed to prove the third prong of the plain-view analysis— the officer had a lawful right of access to the object itself. Specifically, Galloway argues Deputy Stafford did not have lawful access to the gun and magazine because, under *Buie*, "once the threat of unknown attackers dissipates, so does the justification for officers being in the house." *See* ECF No. 85, at 19. Galloway's argument appears to misapprehend the "lawful access" requirement. The Supreme Court and other circuit courts have held the lawful access requirement is intended to prevent warrantless entry onto premises when contraband is viewed from outside of the premises or when contraband that was initially in plain view is not in plain view at the time of seizure. *See Horton,* 496 U.S. at 137 & n.7 (describing the "lawful access" requirement and explaining that even if "[i]ncontrovertible testimony of the senses" establishes that an object in plain view is contraband, "the police may not enter and make a warrantless seizure"); *United States v. Davis*, 690 F.3d 226, 234 (4th Cir. 2012) ("the lawful access requirement is intended to clarify that police may not enter a premises to make a warrantless seizure, even if they could otherwise see (from a lawful vantage point) that there was contraband in plain sight"); *Boone v. Spurgess,* 385 F.3d 923, 928 (6th Cir.2004) (the "lawful right of access" requirement "is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances"; thus, while "lawfully positioned" "refers to where the officer stands when she sees the item," "lawful right of access" refers "to where she must be to retrieve the item"); *United States v. Neely,* 345 F.3d 366, 371 (5th Cir. 2003) (holding the plain view doctrine did not allow the seizure of the patient's clothing, because the clothing at issue was not in open view but in the hospital property storage room, and required permission from hospital personnel to retrieve it).

In deciding whether the third prong of the plain view test is satisfied, the Court considers whether, prior to making a warrantless seizure, the officer lawfully entered (or remained) on the premises. In *Williams,* the Eighth Circuit held "[w]here the initial intrusion that brings the police within plain view of an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. This is true even if a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object." *Williams,* 951 F.3d at 896 (internal citations omitted). In so holding, the Eighth Circuit rejected the argument that law enforcement must leave a residence or leave evidence they discovered during the sweep once the reasons for warrantless entry have dissipated. *Id.* at 896-97. The court held there was no Fourth Amendment violation where officers, who stayed for about an hour to collect large number of incriminating items observed during a lawful protective sweep of defendant's home, called for detectives to help collect all the different types of narcotics located there. *Id.*

Based on the factual findings, Deputy Stafford entered the house, not to retrieve contraband he observed from outside the house, but as a member of a team of officers conducting a constitutionally valid protective sweep. The evidence suggests the gun was first perceived by Officer Ley just as the protective sweep was ending and the officers were preparing to leave the house. Officer Ley relayed this information to Deputy Stafford who was already planning to go to the front bedroom to document damage done by the team prior to entering the house. Although Officer Ley and Deputy Stafford did not see the gun until immediately after the sweep ended, because Deputy Stafford was lawfully in the house to conduct the protective sweep, and, under *Williams*, was authorized to enter Galloway's bedroom after the sweep ended to document "evidence" seen during the sweep, including the hat and other items, his entry into

the bedroom after the sweep ended did not violate the Fourth Amendment. Even if he was mistaken, based on the circumstances, Deputy Stafford reasonably believed Officer Ley saw the gun during the protective sweep. As such, he went to the bedroom to photograph the gun and other "evidence to be had." Although they were partially concealed by the curtain, Deputy Stafford was able to observe the grip of the gun and extended magazine on the table. Because he was lawfully present in the bedroom when he saw the gun and magazine, and because their incriminating nature would have been immediately apparent to him, under the plain view doctrine, Deputy Stafford's seizure of the gun and magazine did not violate the Fourth Amendment.

## CONCLUSION

The officers conducted a constitutionally valid protective sweep incident to Galloway's arrest on three separate arrest warrants. And, although the gun and magazine were not discovered during the sweep, Deputy Stafford reasonably believed they were seen by Officer Ley during the sweep. On that basis, he entered Galloway's bedroom where he observed the grip of the gun and extended magazine. There is no evidence to suggest that, other than conducting the sweep itself, any of the officers including Officer Ley took any action, in contravention of the Fourth Amendment, to reveal the presence of the gun and magazine on the table in Galloway's bedroom. Based on the information available to the officers before, during, and after the sweep, the incriminating nature of the gun and magazine were immediately apparent. For these reasons, Galloway's motion to suppress should be denied.

Accordingly, for the reasons stated in this Memorandum Opinion,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence [ECF No. 36] be **DENIED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Trial will be set by separate order before the Honorable John A. Ross.

Dated: October 27, 2026

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE